[Cite as *In re D.W.J.*, 2026-Ohio-2892.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## CARROLL COUNTY

### IN THE MATTER OF:

### D.W.J., T.W., G.W., DEPENDENT CHILDREN.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 26 CA 0989**

---

Juvenile Appeal from the
Court of Common Pleas, Juvenile Division, of Carroll County, Ohio
Case Nos. 20233006, 20233007, 20233008

**BEFORE:**
Katelyn Dickey, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Steven D. Barnett*, Carroll County Prosecutor, and *Atty. Lacee K. Felix*, Assistant Prosecuting Attorney, for Appellee and

*Atty. Sarah J. Francois,* for Appellant.

Dated:  July 27, 2026

**DICKEY, J.**

{¶1} Appellant, D.W. ("Father"), appeals from the December 30, 2025 judgment of the Carroll County Court of Common Pleas, Juvenile Division, granting legal custody of his minor children, D.W.J. (d.o.b. 7/8/2012), T.W. (d.o.b. 7/8/2012), and G.W. (d.o.b. 10/13/2014) (the "minor children"), to their maternal grandmother, D.W. ("Grandmother"), in Texas following evidentiary hearings. Father's ex-wife and mother of the minor children, J.W. ("Mother"), stipulated to granting legal custody to Grandmother. On appeal, Father raises three assignments of error: (1) the juvenile court erred in finding that the Carroll County Department of Job and Family Services ("Agency") made reasonable efforts toward reunification where the Case Plan was not meaningfully tailored to Father's needs in violation of R.C. 2151.419; (2) the court's decision is against the manifest weight and sufficiency of the evidence; and (3) the court erred in determining that legal custody to Grandmother was in the minor children's best interests. Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

{¶2} Agency became involved with this divorced family on October 3, 2023 due to concerns for substance use, deplorable home conditions, and an incident where a vehicle was pulled over. The car contained the minor children with unknown adults, along with a weapon, drug paraphernalia, and methamphetamine. It was alleged that Mother had taken a handful of pills beforehand, leaving the minor children with these unknown adults. The minor children reported not having enough food in Mother's home, not going to the doctor, dentist, or school regularly, and having to urinate in the bathtub or at a neighbor's house due to inoperable toilets.

{¶3} A court-ordered private custody plan restricted Father's visitation to a public setting. Concerns about Father included past domestic violence allegations and lack of stable housing and employment. The minor children exhibited great fear of Father.

{¶4} On October 4, 2023, Agency filed a complaint alleging the minor children were neglected under R.C. 2151.03(A)(2). Attorney Tiffany Brown, the Court Appointed

Special Advocates (CASA), was appointed Guardian ad Litem ("GAL") for the minor children. Following a shelter care hearing, Father appeared and stipulated to the award of temporary custody to Agency. An initial hearing was held on October 13, 2023, at which time both Father and Mother appeared. The minor children remained in Agency's temporary custody as stipulated by both parents.

{¶5} A Case Plan was filed on November 6, 2023. As to Father, the Case Plan indicated that he was to submit to a parenting assessment with Dr. Aimee Thomas, a Lighthouse Family Center ("Lighthouse") evaluator ("Dr. Thomas"), and to a mental health assessment. Father was to obtain safe, stable housing for the minor children and obtain employment. The goal of the Case Plan was to return the minor children to their parent(s). The Concurrent Case Plan Objective was legal custody with relative/kinship.

{¶6} On November 17, 2023, Agency moved to amend the complaint to one of dependency under R.C. 2151.04(A). Upon the amendment, Father and Mother stipulated to a finding of dependency and consented to the continuation of temporary custody with Agency. At that time, Mother was still testing positive for methamphetamine and Father was homeless.

{¶7} Neither parent attended the disposition hearing on December 15, 2023, although their attorneys were present. Temporary custody of the minor children was continued with Agency. The Case Plan was adopted and approved.

{¶8} Father exercised his first visitation with the minor children on March 17, 2024, after not having seen them since November 2023. A semi-annual review hearing was held on March 29, 2024, with both parents and their respective attorneys. At that time, neither Father nor Mother had completed their parenting assessment and counseling through Lighthouse nor had they completed a mental health and substance abuse assessment. Both parents were continuing to give positive drug screens and neither parent had suitable housing for the minor children. Father was employed through a temp agency but was still homeless and living in his car.

{¶9} On May 10, 2024, the Case Plan was amended because Agency had been advised by the paternal uncle and aunt with whom the minor children had been placed,

that they could no longer provide long term care for them. The minor children were in foster care from May 10, 2024 to August 11, 2024. Adoption was added as a Concurrent Case Plan Objective.

{¶10} On June 21, 2024, the Case Plan was again updated and amended. At that time, Agency had been in touch with Grandmother about possible placement of the minor children with her. While the permanency goal remained returning the minor children to their parent(s), the Concurrent Case Plan Objective was changed back to legal custody with relative/kinship.

{¶11} On July 12, 2024, Agency filed a notice with the juvenile court that an Interstate Compact on the Placement of Children (ICPC) home study of Grandmother's home in Texas was approved. Agency was considering Grandmother as a placement option because there were no other local relatives in Ohio willing or able to accept placement of the minor children.

{¶12} In response to Agency's notice that it was pursuing Grandmother as a placement option, Father filed a motion for an immediate review on July 16, 2024. The next day, Father also filed a motion to prevent the placement pending a hearing. The juvenile court granted that motion and set a hearing for August 5, 2024. Three days later, the court overruled Father's motion and found it was in the children's best interests to be placed with Grandmother in Texas while the parents continued their Case Plan objectives. The minor children were placed with Grandmother on August 11, 2024.

{¶13} On August 20, 2024, Agency filed an updated and amended Case Plan due to the minor children's recent placement with Grandmother. An annual review hearing was held in September 2024, at which time Father and Mother again stipulated to the continuation of temporary custody of the minor children to Agency. Although Father had secured a suitable three-bedroom home, nothing had been set up for the minor children, including no beds. Father had not engaged in any mental health or substance use services nor completed his Lighthouse parenting assessment. The juvenile court found that neither parent had completed their counseling recommendations for parenting,

substance abuse, and/or mental health. A Second Case Plan was adopted and approved.

**{¶14}** In October 2024, Father completed an assessment with CommQuest, a counseling service agency, with no additional recommendations clinically indicated. Mikayla Brannick, Agency Caseworker ("Brannick"), considered Father's mental health and substance use assessment completed. However, it was discovered that Father indicated to CommQuest that he was there for a parenting assessment, rather than a mental health and substance use assessment, contrary to Brannick's direction. In that assessment, Father denied any mental health concerns.

**{¶15}** Finally, Agency received Father's Lighthouse parenting evaluation and Dr. Thomas' recommendations, dated November 9, 2024, after he completed two clinical interviews. Father had not, however, engaged in any recommended services. Due to time constraints, Caseworker Brannick sent a referral to Goodwill on January 6, 2025. Father was to complete Goodwill's intensive parenting course, although he had not yet completed individual counseling, as typically required. Meanwhile, Grandmother expressed to Brannick her willingness to be a more permanent caregiver for the minor children and signed an understanding of legal custody agreement.

**{¶16}** On January 16, 2025, Agency filed a motion requesting that legal custody of the minor children be granted to Grandmother. The juvenile court set the matter for a hearing on February 28, 2025, which was continued to March 28, 2025. On January 23, 2025, Agency filed a copy of Grandmother's statement of understanding of legal custody in compliance with R.C. 2151.353(A)(3), which was signed on January 17, 2025.

**{¶17}** Father was denied entry into Goodwill's parenting program on January 26, 2025, 16 months after he signed the initial Case Plan which contained that requirement. Father obtained stable, full-time employment in February 2025. On February 20, 2025, Agency referred Father back to CommQuest to obtain the correct assessment to comply with Lighthouse recommendations.

{¶18} On March 26, 2025, Father filed a motion for alternate disposition/motion for change of custody to Father.

{¶19} At the March 28, 2025 hearing, Mother expressed her agreement with Agency's motion requesting legal custody to Grandmother. Father requested additional time to complete his Case Plan services. Both parents stipulated to the continuation of temporary custody of the minor children to Agency and their placement with Grandmother.

{¶20} On April 8, 2025, Father was referred to Ohio Guidestone, a behavioral health and family services organization, to complete its parenting classes. This referral was for Father to make progress to get into Goodwill, and not in place of Goodwill, as the Ohio Guidestone program was not intensive enough to meet Lighthouse recommendations.

{¶21} On May 20, 2025, Agency filed a motion requesting that the juvenile court conduct an in-camera interview with the minor children. The court, along with the CASA GAL, conducted the in-camera interview on July 9, 2025, revealing that the minor children had a deep-seated fear of Father and wished to remain with Grandmother.

{¶22} On September 5, 2025, Mother stipulated to Agency's motion to grant legal custody of the minor children to Grandmother, with protective supervision being terminated. Mother acknowledged her short-term sobriety and inability to provide an appropriate living situation for the minor children at that time. Evidentiary hearings proceeded as to Father and were held over four days: September 5, 2025; October 24, 2025; November 14, 2025; and December 5, 2025.

## SEPTEMBER 5, 2025 HEARING

{¶23} Dr. Thomas testified that she evaluated Father beginning July 31, 2024, using interviews and psychological testing. She identified delays in Father's Case Plan efforts, including waiting until April 2024 to initiate visitation and delaying the evaluation, attributing this to an unhealthy romantic relationship with his girlfriend that undermined stability and raised concerns about attachment and prioritization of the minor children.

Dr. Thomas recorded limited reported substance use, past marijuana use, and no reported addiction. She noted anxiety history with past medication, observed avoidance and resistance to counseling, and recommended individual counseling to address anxiety, mood dysregulation, and anger.

{¶24} Structured clinical interview results reflected anxiety that could paralyze decision-making under stress, guardedness, and denial of anger problems contrary to other data. A standardized inventory suggested Father's defensive responding, underlying insecurities, superficial relationships, externalization of blame, and potential hostile outbursts when feeling attacked, supporting anger management and counseling recommendations. Dr. Thomas recommended intensive, face-to-face parenting programming, counseling, drug screens with treatment if positive, and proof of stable employment and housing. She said Father was not receptive to counseling. Dr. Thomas also explained that parents who are homeless are often able to work a Case Plan.

{¶25} Alyssa Karoleski, a CommQuest counselor ("Karoleski"), saw Father from March 24, 2025 to July 9, 2025 for 15 sessions following an assessment recommending individual mental health counseling. Karoleski targeted coping and parenting skills and reported Father met treatment goals. She did not treat substance use because Father denied having any issues.

{¶26} Karoleski counseled Father on prioritizing healthy relationships and working on anger management. She encouraged continuation with the parenting program at Ohio Guidestone. Karoleski coached Father on phone-visit connection strategies. Karoleski did not personally observe the antisocial traits noted by Dr. Thomas but found Father was sometimes defensive. She relied on Father self-reporting. She discharged Father early against a one-year plan because he reported meeting goals.

{¶27} Karoleski noted Father denied leaving the minor children in a hot car for an hour as alleged but she still provided him with safety education. She agreed Father acknowledged seeing how leaving the minor children in a hot car could be a safety concern.

{¶28} Shanna Kuikahi, an Ohio Guidestone Behavioral Health Specialist ("Kuikahi"), provided individualized, structured parenting skills training for Father, typically a 12-lesson curriculum delivered via hybrid telehealth and in-home sessions. She stated Father was included on her caseload for about one month. Father attended and participated in sessions, but expressed dissatisfaction with in-home requirements, scheduling, and certain paperwork. Father ended up requesting that he be transferred to a different worker. Kuikahi did not observe Father with the minor children and was not aware of Lighthouse's evaluation details.

{¶29} Wendra Davis, an Ohio Guidestone Behavioral Health Specialist ("Davis"), delivered a 15-lesson individual parent mentoring curriculum to Father. Davis said completion is judged and graded by participation and assessments. Father scored low on corporal punishment endorsement. Davis described content as medium-intensity, covering routines, safety, discipline, and relationship skills, with no direct observation of parent-child interaction.

{¶30} Grandmother testified she lives in Saline, Texas. She has housed the minor children for over one year at the time she testified at the hearing. Grandmother reported the minor children are in eighth and fourth grades, receive good grades, and are involved in extracurricular activities. The minor children have adjusted well to Grandmother's stable home and are in counseling.

{¶31} Grandmother facilitates weekly phone or video visitation with Father, usually lasting about 30 minutes. She is open to more time and in-person visits, though none have occurred. Grandmother prefers that any Ohio in-person time with Father be supervised by someone if he does not want her present. Grandmother said she would follow court orders but expressed fear for the minor children if sent to Father for extended periods. Grandmother testified Father has not sent gifts, cards, or financial support and has not sent the minor children's belongings despite requests.

{¶32} Grandmother acknowledged a disciplining incident where she pulled T.W.'s hair. She denied knowledge of reports that Mother coached or manipulated the minor

Case No. 26 CA 0989

children.  Grandmother said the minor children's counseling paused due to insurance, but was set to resume on September 24, 2025.

## OCTOBER 24, 2025 HEARING

{¶33} Caseworker Brannick worked as the ongoing caseworker from October 3, 2023 to August 2025.  She testified the case opened after police stopped the vehicle with the minor children and unknown adults, found a weapon and drug paraphernalia inside, and Mother had reportedly taken pills.  Agency did not place the minor children with Father that night due to an existing court order limiting his visitation to supervised public time and the minor children were first placed with paternal relatives.

{¶34} Brannick said initial concerns included Mother's substance use, inadequate home conditions, and both parents' unstable housing and mental health needs.  Case Plan goals were set on November 6, 2023.  She detailed Mother's drug screens: positives for methamphetamine on October 4, 2023, October 20, 2023, August 6, 2024, and October 16, 2024, with other screens negative, and refusals at times.  Brannick also described Father's drug screens: THC positives in early 2024, then a series of negatives from July 2024 through mid-2025.  She testified Father had no in-person contact with the minor children from November 2023 to March 2024.

{¶35} Father obtained a three-bedroom home in July 2024 and maintained employment at Sterilite.  Brannick said the home was suitable for Father but it did not have anything set up for the minor children, including no beds.  Brannick said Goodwill denied Father in January 2025 due to insufficient progress.  Goodwill does not tolerate any aggressive behavior and the program was not willing to chance Father having an outburst and possibly triggering other clients in the class.  Ohio Guidestone was started in April or May 2025 but paused after a dispute.  It later resumed, with completion noted by September 3, 2025.  Brannick testified Lighthouse recommendations for Father included individual counseling, anger management strategies, random drug testing, Goodwill parenting, and maintaining housing and employment.

{¶36} Brannick observed via video that the minor children appeared happy with Grandmother and had their needs met. She said Agency filed to change legal custody to Grandmother, viewed reunification with Father as not ideal due to incomplete Case Plan requirements and concerns about his parenting insight. In addition, the minor children had a deep-seated fear of Father and expressed a preference not to live with him.

{¶37} Leah Batson, an Agency Supervisor ("Batson"), has been involved with this family since the night of the minor children's removal on October 3, 2023. She took over this case as the primary caseworker after Caseworker Brannick left Agency. Batson confirmed the initial traffic stop involved Mother sending the minor children with unknown adults in a vehicle containing drugs and a knife. Batson also confirmed the existing court order limiting Father's visitation. She heard reports that the minor children were fearful of Father.

{¶38} Batson assumed supervision in August 2025 and conducted home visits in September and October 2025. She found Father's home appropriate. However, Father lacked clothing for the minor children. Father did not send gifts or financial support to Texas and did not travel to visit the minor children. Agency could have coordinated supervision if Father had asked.

{¶39} Batson explained Goodwill denied Father in January 2025 for insufficient progress. Ohio Guidestone, which is less intensive than Goodwill, was used in the interim. Agency's primary concerns were Father's lack of extended parenting, lack of demonstrated behavioral change through intensive parenting services, and reports of the minor children's great fear of Father. The Case Plan required following Lighthouse recommendations. Batson testified Lighthouse results were provided to Father and CommQuest. Agency expected the parents to start counseling while awaiting Lighthouse. In Agency's view, Father did not seriously engage in services until around March 2025. The CommQuest assessment reflecting engagement is dated March 20, 2025, and the Ohio Guidestone completion is September 3, 2025.

{¶40} Batson stated the minor children's needs were met by Grandmother in Texas. A Texas caseworker visited them monthly. Batson agreed counseling would be

beneficial. She noted a reported one-time incident of Grandmother pulling T.W.'s hair, deeming that type of discipline inappropriate. Batson confirmed there is no reasonable justification known to her for Father's 18-month delay in engaging in mental health and parenting services after the case filing, despite Agency encouraging early counseling.

## NOVEMBER 14, 2025 HEARING

**{¶41}** The GAL testified she was appointed in October 2023. She first met the minor children at their aunt and uncle's home in late October or early November 2023. The minor children were emotional, protective of Mother, and wanted to return to her at that time. The minor children have not expressed any desire to return to Father. The GAL reported the minor children enjoyed some visits with Father when supervised by the aunt and uncle. However, the minor children greatly feared past incidents and did not believe Father would protect them in his full-time care.

**{¶42}** The GAL attempted to meet with Mother but saw little engagement, observed no visits due to Mother's cancellations, and met Mother only a few times. The GAL indicated Father initially engaged, then disengaged after November 2023. Father briefly re-engaged around Easter 2024, then disengaged again, then re-engaged in July 2024 at Agency. During that visit, the minor children sought Father's attention and approval but the GAL observed no close bond. The GAL noted that Father's anger toward Agency impacted his responsiveness to the minor children. She verified Father's employment via a temp agency. Father's Lighthouse counseling began in late July 2024 and concluded in October 2024.

**{¶43}** The GAL had no other observed visits before the Texas move because Father stopped visiting or calling while the minor children were with their aunt and uncle. After placement with Grandmother in Texas, the GAL maintained contact via phone and Zoom. The minor children stated they wanted to live with Mother if she became healthy. Otherwise, the minor children desired to remain with Grandmother. The minor children reported fear of Father's physical discipline, neglect, and poor parenting decisions. The GAL discussed those concerns with Father and his CommQuest counselor, Karoleski.

Case No. 26 CA 0989

{¶44} The GAL reviewed CommQuest records and believed counseling did not address the concerns, citing discrepancies between the counselor's statements to her and written progress reports, and attributing progress notes to Father's self-reporting. The GAL opined Father needed intensive counseling as recommended by Dr. Thomas to address personality concerns and parenting evaluation issues, including Father prioritizing a romantic relationship over the minor children and failing to internalize its impact. The GAL acknowledged Father achieved housing and employment but stated Goodwill would not accept him until he made significant counseling progress, which she did not believe had occurred.

{¶45} The GAL listened to some Father-recorded calls. The GAL found most calls appropriate but noted one call with repetitive questioning that frustrated the minor children. The GAL had phone contact with Grandmother, found that placement appropriate, requested counseling for the minor children, and addressed a reported one-time hair-pulling incident as inappropriate discipline. The GAL reported the minor children appeared healthy and happy with Grandmother, had basic needs met, and felt comfortable. Grandmother facilitated phone/video contact with Mother. Grandmother would comply with court-ordered contact with Father despite a contentious relationship.

{¶46} The GAL revealed the minor children wanted Father more engaged, were upset when he disappeared, and recounted incidents they feared, including: dislocating T.W.'s arm; finger bending; smacking and slapping (not G.W. personally); being thrown down when unresponsive; being left in a hot car while Father took his girlfriend into an office; and a camping incident involving bug spray. Apparently, Father and his girlfriend took the minor children camping but had them sleep in separate tents. Father and girlfriend had bug spray for themselves only. The minor children woke up the next morning covered in bug bites because Father never shared his bug spray with them. The GAL testified she saw no significant parenting-style change sufficient to make the minor children feel safe with Father at that time. The GAL expressed concern that Father did not internalize lessons from counseling and believed his progress was superficial. She acknowledged Father's progress in housing and employment but maintained that he had

not achieved meaningful change needed for reunification.  The GAL opined Grandmother would follow court orders for contact and recommended ongoing phone/video access and supervised visits for Father.  The GAL supported Grandmother receiving legal custody while Father pursued more intensive counseling and potentially Goodwill parenting thereafter.

**{¶47}** Father testified he shares the three minor children with Mother.  The parties previously had a shared parenting plan with 50/50 time split until allegations by Mother in August 2023 led to temporary restrictions just before this case commenced.  Father described limited supervised-like public visits under the prior case, and at the start of this case, he had been evicted, stayed with his brother, then lived in his car from November 2023 to April 2024.  Father moved to a motel before obtaining housing in Canton in July 2024.  Father has maintained employment at Sterilite.

**{¶48}** Father acknowledged survival mode impeded early service engagement and visitation.  Father said he missed visits with the minor children due to finances.  Father last saw the minor children in person in late July or early August 2024 at Agency.  He had not seen them in person since they moved with Grandmother to Texas on August 11, 2024.

**{¶49}** Father testified he began Lighthouse with Dr. Thomas on July 31, 2024.  He received Lighthouse recommendations from the caseworker on December 31, 2024.  Father read the recommendations into the record, including: individual counseling for anxiety, mood dysregulation, anger strategies, and personality issues; processing prioritization of a dysfunctional relationship; Goodwill parenting; random drug and alcohol screens with treatment if positive; and maintaining housing and employment.  Father reported working on coping, communication, and parenting strategies with CommQuest counselor, Karoleski.  Father acknowledged a July 2024 THC positive drug test but said all later tests were negative.  Father said he completed an online parenting course in February 2025 and later multiple parenting lessons with Ohio Guidestone.  Father testified he was declined by Goodwill.

**{¶50}** Regarding the minor children's great fears and past incidents, Father disputed that he dislocated T.W.'s arm. Father described the hot car incident involving the minor children as brief, and stating that it was early morning with mild temperatures. Father acknowledged he would handle that scenario differently today. Father attributed much of the minor children's fear to manipulation by Mother and Grandmother but accepted some personal responsibility. Father had concerns about Grandmother's discipline and opposed the minor children's move to Texas. On cross-examination, Father admitted the minor children were not in counseling or current on medical/dental treatment.

## DECEMBER 5, 2025 HEARING

**{¶51}** Father's testimony continued on cross-examination. Father indicated he completed counseling with CommQuest. He discussed anger management topics during 15 weeks of counseling, focusing on positive outlets and calm strategies. Father characterized himself as a work in progress. He attributed lapses in Agency contact to his homelessness and financial issues. Father claimed his requests for gas vouchers to visit the minor children were not fulfilled by the caseworker. He did not escalate voucher issues to a supervisor, assuming others would also refuse.

**{¶52}** Father denied refusing a March 4, 2025 home entry, claiming the caseworker came only for a drug screen. Father also denied prioritizing a romantic relationship over the minor children, discussing an on-and-off relationship with his girlfriend. Father identified high stress as an anger trigger. Father described control issues that contributed to job losses. Father had never priced travel to visit the minor children in Texas.

**{¶53}** On re-direct, Father identified physical manifestations of anger he learned to recognize through Counselor Karoleski as part of anger management.

**{¶54}** Supervisor Batson testified that Agency supervised visits. She confirmed visits were allowed in foster care and did not recall any denial of visits. Batson stated contact lapses hindered aiding Father's service engagement, as Agency sometimes

lacked a way to reach him and was not contacted by him. She said assistance discussed included homeless shelter contacts and gas vouchers requiring use at contracted county vendors, and similar support could have been arranged for Lighthouse appointments. She was unaware of any denial of aid and said Father could have contacted a supervisor. Batson confirmed the minor children felt safe with Grandmother in Texas.

## DECEMBER 30, 2025 JUDGMENT

**{¶55}** The juvenile court granted legal custody of the minor children to Grandmother following the hearings. The court weighed and considered the wishes of the parents. Mother wanted the minor children placed with Grandmother. Father wished to have legal custody. In its judgment, the court issued findings of fact and considered the best interests of the children under R.C. 3109.04(F)(1), specifically stating the following:

> Based upon the evidence and testimony provided over the course of the hearing on the competing Motions for Legal Custody, the Court finds that the children have been continuously in the temporary custody of [Agency] since the shelter care hearing on October 4, 2023.

> The Court further finds that at the hearing on September 5, 2024, Mother, through her counsel, stipulated to the grant of legal custody of the children to Grandmother as requested in [Agency's] motion.

> The Court further finds that at the time the case was filed on October 4, 2023, Father had been evicted from his residence and was living with his brother. Father continued to live with his brother until approximately November 6, 2023.

> The Court further finds that Father was homeless and living in his car from approximately November 5, 2023, until late April of 2024.

The Court further finds that Father was living in the Crown Motel in Massillon, Ohio from late April 2024 until July 24, 2024.

The Court further finds that following the children's removal from the home of their paternal uncle and aunt . . . the children were in foster care from May 10, 2024, until August 11, 2024.

The Court further finds that Father did not visit his children from late April 2024 until shortly before the children went to Texas to be with Grandmother in August of 2024, despite his ability to do so.

The Court further finds that the initial Case Plan signed by Father on November 2, 2023, referred him to Lighthouse Family Center for a parenting assessment and mental health counseling. He was to follow through with all recommendations made by Lighthouse Family Center and his mental health provider.

The Court further finds that although referred to Lighthouse Family Center in November of 2023, Father did not engage with Lighthouse until July 31, 2024.

The Court further finds that Father's delay in engaging with Lighthouse [F]amily Services was due to his prioritizing his romantic relationship over his children.

The Court further finds that Father's completed Lighthouse Family Services parenting assessment was not received by [Agency] until December 11, 2024, over a year since the filing of the case and the initial referral.

The Court further finds that the Lighthouse Family Center report recommended that Father:

Case No. 26 CA 0989

Participate in individual mental health counseling;

Successfully complete Goodwill parenting classes;

Submit to random drug and alcohol screens and, should he test positive, participate in substance abuse treatment services[;]

Demonstrate his ability to maintain gainful employment and housing that is safe and appropriate for himself and his children.

The Court further finds that Father chose not to engage in mental health counseling when recommended by Lighthouse Family Services because, in his words, he got everything "fixed" in that he had a job and a place to live.

The Court further finds that Father finally engaged with CommQuest for his mental health and substance abuse assessment until [sic] March 20, 2025, approximately eighteen (18) months since the filing of the case.

The Court further finds that Father was discharged from CommQuest on July 9, 2025, without an independent, objective mental health determination of his success, but rather because he "self-reported" that he had met his goals.

The Court further finds that in April of 2025, Father engaged in a parenting skills program through Ohio Guidestone with Shanna Kuikahi.

The Court further finds that Father completed the Ohio Guidestone parenting skills program, but that the Ohio Guidestone program is not the equivalent of the Goodwill parenting program as recommended. The specialist who administered Ohio Guidestone's program never observed Father with his children, permitted Father to participate in his lessons over

the telephone, and notably pointed out that she has never had a parent in her program who didn't pass.

The Court further finds that while Father has completed a parenting program, he has not acknowledged, nor does he understand the impact of his choices on his children. In general, Father has exhibited a lack of introspection regarding his behaviors and their effect on his children.

The Court further finds that Father has failed to internalize [the] changes which he needs to make in his own behaviors in order to safely parent his children.

The Court further finds that the children do not have a close bond with their Father.

The Court further finds that since the outset of this case[,] the children have expressed a genuine fear of their father.

The Court further finds that the children do not wish to be placed in Father's custody but wish to remain in Grandmother's custody or be returned to their Mother if she were well.

The Court further finds that the children do not wish to be in Father's custody because of their fear of physical discipline, their fear of overall neglect by their Father, and because of Father's history of poor parenting decisions and a fear that those poor decisions would continue.

The Court further finds that since August 11, 202[4], when the children were placed with Grandmother, Father has never provided gifts or any basic necessities to his children; nor has he ever sent birthday or Christmas gifts or cards, nor has he provided any sort of financial support, nor has he ever . . . asked if he could visit his children.

Case No. 26 CA 0989

The Court further finds that Grandmother's home is an appropriate placement for the children and that the children are healthy, happy, comfortable, and bonded to Grandmother.

The Court further finds that Father has a general attitude of blaming others for his failures in this matter. He blames his failure to visit with his children on his lack of money to purchase gas for his car even though he was offered free gas cards by [Agency]. He blames his delay in initiating his parenting evaluation at Lighthouse Family Services on his own financial issues even though he was not required to pay for such services. When confronted with certain child safety services recommended by a counselor, Father simply stated that the counselor exaggerated the situation. When asked why he didn't complete the Goodwill parenting classes, Father complained that he was never notified of the requirement even though he signed the initial Case Plan which contained that recommendation. When asked why he didn't tell the GAL of his concerns, Father responded that, "She was never around." When asked if Father blamed the Caseworker for his situation, he bluntly stated that she was not really concerned with the best interests of his children. When confronted with the fact that the children repeatedly reported their fear of him, Father stated that such reports were "fabrications." When asked if he learned about unhealthy relationships and the impact on his children, Father indicated that he "hasn't been concerned about that." When asked why he didn't communicate with [Agency] or engage in Case Plan services, Father blamed his homelessness, even though Dr. Aimee Thomas of Lighthouse Family Services explained that parents who are homeless are often able to work a Case Plan.

In addition to the above findings, the Court also considered each subsection of R.C. §3109.04(F)(1) and finds as follows:

Case No. 26 CA 0989

**(a) The wishes of the child's parents regarding the child's care:** Father wishes to have legal custody of his children. Mother wishes the children to be placed in the legal custody of Grandmother.

**(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as explained to the court:** Based upon the Court's in-camera interview with the children, the children clearly wish to remain in the custody of Grandmother or return to the custody of their mother if she were well. They do not wish to be in the custody of their Father.

**(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest:** The children have a deep-seated fear that their Father, if granted custody, will not take care of them. Obviously, their fear affects their interactions with him. Father, on the other hand, has allowed his anger toward [Agency] to affect his interactions with his children. When Father's interactions with his children [were] observed by the GAL, she noted that Father did not give them the attention or approval which they sought. There was interaction, but not a close bond between them. The children also interact with Grandmother with whom they have lived since August of 2024. The GAL has described the children as healthy, happy, and comfortable with Grandmother, and that it is an appropriate placement.

**(d) The child's adjustment to the child's home, school, and community:** The children were initially cautious when they were place[d] with Grandmother in August of 2024, but now they are happy, have friends, and enjoy school. The children have not lived with either parent since the case was first opened on October 4, 2023.

**(e) The mental and physical health of all persons involved in the situation:** There were no issues of physical health identified for Father. Based upon Father's reports of anger and anxiety, he was referred for mental health counseling. However, Father resisted engagement with mental health services for approximately a year and a half after the case was opened. While Father then participated in counseling and learned some skills, unfortunately, he never internalized the changes that needed to be made in his behaviors. As for Grandmother with whom the children are now placed, there were no mental health or physical issues identified.

**(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights:** It is unknown if Father would honor court ordered parenting/companionship time, although it appears likely that Father's anger or anxiety might have an effect on his actions in this regard. Grandmother testified that she was open to parenting time for Father. The GAL believes that Grandmother will do what she is ordered to do and would facilitate the relationship.

**(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor:** N/A

**(h) Whether either parent or any member of the household of either parent previously has been convicted of or plead guilty to any criminal offense involving any act that resulted in a child being an abused child or neglected child; whether either parent, in a case in which a child has been adjudicated an abused or neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis for the adjudication; whether either parent previously has been convicted or pleaded guilty to a violation**

**of R.C. § 2919.25 involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent previously has been convicted or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is a reason to believe that either parent has acted in a manner resulting in a child being an abused or a neglected child:** Neither Father nor Grandmother have been convicted, pleaded guilty, or have been determined to be a perpetrator of any of the above. However, the Court notes that the initial Complaint filed in this case contained allegations that the children were neglected.

**(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court:** There is no evidence of this.

**(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state:** Father is a resident of the State of Ohio, while Grandmother resides in the State of Texas.

. . .

Based upon the foregoing, the Court specifically finds that it is in the best interests of the minor children . . . that legal custody be granted to [Grandmother]. The motion filed by [Agency] is hereby granted and the motion filed by [Father] is denied. Legal custody of the minor children is hereby awarded to [Grandmother] and as such, this case is now closed and terminated.

(12/30/2025 Judgment Entry, p. 4-10).

**{¶56}** Father filed a timely appeal and raises three assignments of error.

## LEGAL CUSTODY REVIEW

"[L]egal custody where parental rights are not terminated is not as drastic a remedy as permanent custody." *In re Nice*, 141 Ohio App.3d 445, 455, 751 N.E.2d 552 (2001). Accordingly, "[t]he trial court's standard of review is not clear and convincing evidence, as it is in a permanent custody proceeding, but is merely preponderance of the evidence." *Id.* An award of legal custody is reviewed for an abuse of discretion. *Id.* [An abuse of discretion occurs when a court exercises its judgment "in an unwarranted way[,] in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.]

If the court's decision on the children's best interests or on other factual issues surrounding legal custody is not supported by competent and credible evidence, then it is unreasonable. *Nice*, 141 Ohio App.3d at 455, 751 N.E.2d 552. Credibility issues are critical in custody cases, and important information may be evident from the demeanor and attitude of the witnesses that does not translate into the record. *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997). The trial court is in the best position to weigh the testimony and observe the witnesses' demeanor in order to gauge their credibility. *Id.* at 418-419, 674 N.E.2d 1159. To the extent a trial court's application of a statute presents a question of law, our review is de novo. *In the Matter of J.R.P.*, 7th Dist. Mahoning, 2018-Ohio-3938, 120 N.E.3d 83, ¶ 24.

*In re M.G.*, 2023-Ohio-3423, ¶ 8-9 (7th Dist.).

**ASSIGNMENT OF ERROR NO. 1**

**THE TRIAL COURT ERRED IN FINDING THAT THE AGENCY MADE REASONABLE EFFORTS TOWARD REUNIFICATION WHERE THE CASE PLAN WAS NOT MEANINGFULLY TAILORED TO THE PARENT'S NEEDS, IN VIOLATION OF R.C. 2151.419.**

{¶57} In his first assignment of error, Father argues the juvenile court erred in finding Agency made reasonable efforts toward reunification where the Case Plan was not meaningfully tailored to his needs in violation of R.C. 2151.419.

{¶58} R.C. 2151.419, "Hearings on efforts of agencies to prevent removal of children from homes," states in part:

> [A]t any hearing . . . at which the court removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency . . . has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home. . . .

R.C. 2151.419(A)(1).

> [A]ppellate courts review a trial court's finding that an Agency made reasonable efforts toward reunification under a manifest weight of the evidence standard of review. *In re E.H.*, 6th Dist. Ottawa No. OT-15-044, 2016-Ohio-8170, ¶ 23. "Thus, '[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.'" *C.E. Morris Co. v. Foley Contr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), paragraph one of the syllabus. "'In a reasonable efforts determination, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the

statute.'" *In re E.H.* at ¶ 23, quoting *In re S.R.*, 6th Dist. Lucas Nos. L-12-1298 and L-12-1326, 2013-Ohio-2358, ¶ 21. "A 'reasonable effort' is an 'honest, purposeful effort, free of malice and the design to defraud or to seek an unconscionable advantage.'" *Id.*

Reasonable efforts for reunification can be shown through the development and facilitation of a case plan by the Agency; the Agency is required to demonstrate that it developed and facilitated a plan to "'account for the respective abilities of the parents and children in pursuing individualized concerns, goals, and steps necessary for reunification.'" *In re Am.H., Al.H.*, 6th Dist. Lucas No. L-19-1025, 2019-Ohio-4374, ¶ 31; *In re: H.S., Z.M., I.M., P.S.*, 2019-Ohio-4334 at ¶ 18. When the parent does not complete the case plan, through no fault of the Agency, the Agency has made reasonable efforts at reunification. *In re Am.H., Al.H.*, 2019-Ohio-4374, ¶ 31-32. . . .

*Matter of R.M.*, 2019-Ohio-5251, ¶ 34-35 (7th Dist.).

**{¶59}** In this case, to say there was a lack of reasonable efforts or the Case Plan was not sufficiently tailored is contrary to the record. At the October 4, 2023 shelter care hearing, the juvenile court determined that Agency made reasonable efforts to prevent the need for removal, but there were exigent circumstances. The court found that at the time of removal, Mother appeared to be under the influence of drugs, the home was in a deplorable condition, Father was only permitted to see the minor children in a public setting, and Father lacked stable housing and employment. Father was present at that hearing and stipulated that probable cause existed for the emergency shelter care order awarding temporary custody to Agency.

**{¶60}** At the parties' initial hearing, the juvenile court noted Agency's continued reasonable efforts to prevent the need for removal and/or to make it possible for the minor children to return home. The court indicated again that Mother had tested positive for methamphetamines, Father had no stable residence or employment, the minor children's

home was in a deplorable condition, and prior court orders limited Father's involvement with the minor children.

{¶61} The November 6, 2023 Case Plan, signed by Father, contained the permanency goal of reunification and noted current placement in an approved relative's home. The initial case plan services pertaining to Father included a mental health and substance use assessment, a Lighthouse parenting evaluation and compliance with the recommendations contained therein, and for Father to secure stable housing and employment. The family's progress would be measured by completing and complying with the Lighthouse parenting and mental health assessments, and following through with all recommendations made by Lighthouse and mental health providers. The goal of the Case Plan was to return the minor children to their parent(s).

{¶62} At the November 2023 adjudication hearing, Father and Mother admitted to the minor children's dependent status and stipulated to temporary custody to Agency. The juvenile court found that Agency made reasonable efforts to reunify the minor children, noting the same findings as in the prior initial order. Neither parent attended the December 2023 disposition hearing. Agency presented testimony that both parties were resistant to Case Plan services, neither had visited with the minor children nor engaged in treatment, and Father was now homeless. The court found that Agency made reasonable efforts to reunify, but that Mother had continued to test positive for methamphetamine, parenting skill concerns existed, and Father was living in his car. The Case Plan was adopted and approved at that time.

{¶63} The juvenile court reviewed Agency's reasonable efforts to reunify the minor children at the March 29, 2024 semi-annual review hearing, finding that reasonable efforts had been made. However, neither Father nor Mother made sufficient progress under the Case Plan in order to safely reunify the minor children. Neither party had completed their parenting assessment and counseling through Lighthouse nor had they completed a mental health and substance abuse assessment. Both parents were continuing to give positive drug screens and neither parent had suitable housing for the minor children. Father was employed through a temp agency but was still homeless and living in his car.

Father had no contact with Agency or the minor children from November 2023 to March 2024, and did not engage in any services in that time period.

{¶64} The June 21, 2024 amended Case Plan was solely for placement change. The minor children had been removed from their relative placement into a foster home. Agency had been in touch with Grandmother about possible placement of the minor children with her. The original stated goals were unchanged due to lack of progress.

{¶65} At the August 2024 hearing regarding placement of the minor children in Texas with Grandmother, the juvenile court found that Agency continued to make reasonable efforts to reunify the children with their parent(s) but that Father and Mother still had not made sufficient Case Plan progress. Shortly thereafter, another amended Case Plan was filed citing the placement change to Grandmother in Texas. Again, the original stated goals were unchanged due to lack of progress.

{¶66} At the September 2024 annual review hearing, the juvenile court reviewed Agency's reasonable efforts since the semi-annual review. Father and Mother again stipulated to the continuation of temporary custody of the minor children to Agency. Although Father had secured a suitable three-bedroom home, nothing had been set up for the minor children, including no beds. Father had not engaged in any mental health or substance use services nor completed his Lighthouse parenting assessment. The juvenile court found that neither parent had completed their counseling recommendations for parenting, substance abuse, and/or mental health. Despite the fact that Father had made positive progress in some areas, Agency was not comfortable returning the minor children to him due to continued concerns about their deep-seated fears of him, his parenting, and the instability throughout their lives. There was no internalized behavior change in parenting to warrant reunification.

{¶67} The Case Plan was never amended to remove the goal of completing Goodwill parenting classes. It was not until March 2025 that Agency observed Father starting to engage in services more seriously. However, Father's counseling with CommQuest did not thoroughly address the concerns outlined in the Lighthouse evaluation and he did not substantially complete counseling.

Case No. 26 CA 0989

{¶68} Upon consideration, there was competent, credible evidence that Agency made reasonable efforts at reunification. Father's and Mother's parental rights were not terminated. Because the juvenile court awarded legal custody to Grandmother, reunification is not precluded as the parents still retain their parental status and ability to petition the court for change of custody in the future. *See In re J.R.P.*, 2018-Ohio-3938, ¶ 55 (7th Dist.).

{¶69} Father's first assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT'S DECISION IS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.**

## ASSIGNMENT OF ERROR NO. 3

**THE TRIAL COURT ABUSED ITS DISCRETION IN DETERMINING THAT LEGAL CUSTODY WAS IN THE CHILDREN'S BEST INTEREST, FAILING TO PROPERLY WEIGH BEST INTEREST FACTORS.**

{¶70} In his second assignment of error, Father contends the juvenile court's decision granting legal custody of the minor children to Grandmother is against the manifest weight and sufficiency of the evidence.

{¶71} In his third assignment of error, Father asserts the juvenile court erred in determining that granting legal custody to Grandmother was in the minor children's best interests.

{¶72} Father believes the juvenile court's decision granting legal custody to Grandmother was not in the minor children's best interests and against the manifest weight and sufficiency of the evidence. Because Father's arguments are interrelated, we will consider them together for ease of discussion.

> After a child is adjudicated abused, neglected, or dependent, the court may award legal custody to a non-parent after finding that legal

> custody is in the child's best interests. R.C. 2151.353(A)(3); R.C. 2151.415(B). Legal custody is significantly different than the termination of parental rights—despite losing legal custody of a child, the parents of the child retain residual parental rights, privileges, and responsibilities. R.C. 2151.353(A)(3)(c).

*In re G.M.*, 2011-Ohio-4090, ¶ 14 (8th Dist.).

> In determining a legal custody motion, . . . courts can consider the best interest factors in R.C. 2151.414(D) (applicable to permanent custody) in conjunction with R.C. 3109.04(F)(1) (applicable to allocation of parental rights). *See, e.g., In re K.D.*, 2017-Ohio-4161, 92 N.E.3d 123, ¶ 7 (9th Dist.). The permanent custody statute lists factors such as the child's interactions, interrelationships, wishes, custodial history, and need for permanence. R.C. 2151.414(D) (and whether subdivisions (E)(7)-(11) are applicable). The custody statute includes similar considerations and additionally lists the child's adjustment, the mental and physical health of all involved, support arrearage, the history and likelihood of honoring visitation orders, certain convictions, and establishment of a residence out of state or plan to do so. R.C. 3109.04(F)(1).

*In re M.G.*, 2023-Ohio-3423, at ¶ 30 (7th Dist.).

> Sufficiency asks whether the evidence was adequate as a matter of law. [*In re Z.C.*, 2023-Ohio-4703,] ¶ 13, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In reviewing the sufficiency of the evidence, we view all evidence, including reasonable inferences, in the light most favorable to the party filing the complaint to ascertain whether "any" rational trier of fact could have found the contested item proven by the applicable standard of proof. *State v. Getsy*, 84 Ohio St.3d 180, 193 (1998). Circumstantial evidence inherently possesses the same probative value as direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485 (2001).

Where an appellant claims the decision is contrary to the manifest weight of the evidence, the appellate court weighs the evidence and all reasonable inferences, considers the credibility of the witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created a manifest miscarriage of justice requiring a new trial. *In re Z.C.* at ¶ 14. There is a presumption in favor of the trier of fact, to whom we defer in part because of their superior position from which to view the demeanor, gestures, and voice inflections of the witnesses in order to assess credibility. *Id.* at ¶ 14, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984) (construing the evidence consistent with the judgment when susceptible to more than one construction). "Although the concepts are different, the finding that a [judgment] is not against the manifest weight of the evidence necessarily includes a finding of sufficiency." *State v. Boyd*, 2023-Ohio-271, ¶ 23 (7th Dist.).

*In re J.H.*, 2025-Ohio-2380, ¶ 73-74 (7th Dist.).

**{¶73}** As stated, evidentiary hearings were held over four days.

**{¶74}** At the September 5, 2025 hearing, Dr. Thomas identified delays in Father's Case Plan efforts, including waiting until April 2024 to initiate visitation and delaying the evaluation; she attributed this to an unhealthy romantic relationship with Father's girlfriend that undermined stability and raised concerns about attachment and prioritization of the minor children; Dr. Thomas recorded limited reported substance use, including past marijuana use; she noted Father's anxiety history with past medication, observed avoidance and resistance to counseling, and recommended individual counseling to address anxiety, mood dysregulation, and anger; structured clinical interview results reflected anxiety that could paralyze decision-making under stress, guardedness, and denial of anger problems; a standardized inventory, including potential hostile outbursts, supported anger management and counseling recommendations; Dr. Thomas recommended intensive, face-to-face parenting programming, counseling, drug screens with treatment if positive, and proof of stable employment and housing; she said Father

Case No. 26 CA 0989

was not receptive to counseling and explained that parents who are homeless are often able to work a Case Plan; Counselor Karoleski saw Father from March 24, 2025 to July 9, 2025 for 15 sessions following an assessment recommending individual mental health counseling; she counseled Father on prioritizing healthy relationships and working on anger management; Karoleski found Father was sometimes defensive; she relied on him self-reporting; she agreed Father acknowledged seeing how leaving the minor children in a hot car could be a safety concern; Behavioral Health Specialist Kuikahi provided individualized, structured parenting skills training for Father; Father expressed dissatisfaction with in-home requirements, scheduling, and certain paperwork and requested a transfer to a different worker; Behavioral Health Specialist Davis delivered a 15-lesson individual parent mentoring curriculum to Father; he scored low on corporal punishment endorsement; Grandmother lives in Texas and has housed the minor children for over one year at the time she testified at the hearing; the minor children receive good grades and are involved in extracurricular activities; they have adjusted well to Grandmother's stable home and are in counseling; Grandmother facilitates weekly phone or video visitation with Father; she expressed fear for the minor children if sent to Father for extended periods; and Grandmother testified Father has not sent gifts, cards, or financial support and has not sent the minor children's belongings despite requests.

{¶75} At the October 24, 2025 hearing, Caseworker Brannick testified she worked as the ongoing caseworker from October 3, 2023 to August 2025; Brannick said initial concerns included Mother's substance use, inadequate home conditions, and both parents' unstable housing and mental health needs; she described Father's drug screens (THC positives in early 2024, then a series of negatives from July 2024 through mid-2025); Father had no in-person contact with the minor children from November 2023 to March 2024; Father obtained a house in July 2024 and maintained employment; Brannick said the home was suitable for Father but it did not have anything set up for the minor children, including no beds; Goodwill denied Father in January 2025 due to insufficient progress; Goodwill does not tolerate any aggressive behavior and the program was not willing to chance Father having an outburst; Ohio Guidestone was started in April or

May 2025, but paused after a dispute, and it later resumed with completion by September 3, 2025; Brannick observed via video that the minor children appeared happy with Grandmother and had their needs met; Agency viewed reunification with Father as not ideal due to incomplete Case Plan requirements, concerns about his parenting insight, and the minor children had a deep-seated fear of Father and expressed that they do not want to live with him; Supervisor Batson has been involved with this family since October 3, 2023; she heard reports that the minor children were fearful of Father; Batson conducted home visits in September and October 2025, finding that Father lacked clothing for the minor children; Father did not send gifts or financial support to Texas and did not travel to visit the minor children; Agency's primary concerns were Father's lack of extended parenting, lack of demonstrated behavioral change through intensive parenting services, and reports of the minor children's great fear of Father; in Agency's view, Father did not seriously engage in services until around March 2025; Batson stated the minor children's needs were met by Grandmother in Texas; and she confirmed there is no reasonable justification known to her for Father's 18-month delay in engaging in mental health and parenting services after the case filing, despite Agency encouraging early counseling.

{¶76} At the November 14, 2025 hearing, the GAL testified the minor children have not expressed any desire to return to Father; the GAL reported the minor children greatly feared past incidents and did not believe Father would protect them in his full-time care; she observed no close bond between Father and the minor children; Father's anger impacted his responsiveness to the minor children; after placement with Grandmother in Texas, the minor children stated they wanted to live with Mother if she became healthy; otherwise, the minor children desired to remain with Grandmother; the minor children reported fear of Father's physical discipline, neglect, and poor parenting decisions; the GAL opined Father needed intensive counseling as recommended by Dr. Thomas to address personality concerns and parenting evaluation issues; she reported the minor children appeared healthy and happy with Grandmother, had basic needs met, and felt comfortable; the GAL revealed the minor children wanted Father more engaged, were

upset when he disappeared, and recounted incidents they feared, including: dislocating T.W.'s arm; finger bending; smacking and slapping (not G.W. personally); being thrown down when unresponsive; being left in a hot car while Father took his girlfriend into an office; and a camping incident involving bug spray; the GAL testified she saw no significant parenting-style change sufficient to make the minor children feel safe with Father; she expressed concern that Father did not internalize lessons from counseling and believed his progress was superficial; she maintained that he had not achieved meaningful change needed for reunification; the GAL supported Grandmother receiving legal custody while Father pursued more intensive counseling and potentially Goodwill parenting thereafter; Father said he missed visits with the minor children due to finances; Father testified he has not seen the minor children since they moved with Grandmother to Texas on August 11, 2024; Father acknowledged a July 2024 THC positive drug test but said all later tests were negative; regarding the minor children's great fears and past incidents, Father disputed that he dislocated T.W.'s arm; he described the hot car incident involving the minor children as brief, and stated that it was early morning with mild temperatures; he accepted some personal responsibility for the minor children's fear of him; and Father admitted the minor children were not in counseling or current on medical/dental treatment.

{¶77} At the December 5, 2025 hearing, Father characterized himself as a work in progress; he attributed lapses in Agency contact to his homelessness and financial issues; Father identified high stress as an anger trigger; he described control issues that contributed to job losses; Father had never priced travel to visit the minor children in Texas; he identified physical manifestations of anger he learned to recognize through Counselor Karoleski as part of anger management; Supervisor Batson testified that Agency sometimes lacked a way to reach Father and was not contacted by him; she was unaware of any denial of aid for Father; and Batson confirmed the minor children felt safe with Grandmother in Texas.

{¶78} Following the evidentiary hearings, the juvenile court made 26 findings, including, inter alia: that the minor children have been continuously in the temporary

Case No. 26 CA 0989

custody of Agency since the shelter care hearing on October 4, 2023; Mother stipulated to granting legal custody to Grandmother; Father was homeless and living in his car from about November 2023 until April 2024; after the minor children went to Texas to be with Grandmother, Father never visited them despite his ability to do so; Father did not engage with Lighthouse until July 2024 due to his prioritizing his romantic relationship over his children; Father chose not to engage in mental health counseling when recommended by Lighthouse; Father has exhibited a lack of introspection regarding his behaviors and their effect on the minor children; Father has failed to internalize the changes which he needs to make in his own behaviors in order to safely parent the minor children; the minor children do not have a close bond with Father; since the outset of this case, the minor children have expressed a genuine fear of Father; the minor children do not wish to be placed in Father's custody but wish to remain in Grandmother's custody or be returned to Mother if she were well; the minor children do not wish to be in Father's custody because of their fear of physical discipline, their fear of overall neglect by Father, and because of Father's history of poor parenting decisions and a fear that those poor decisions would continue; since August 11, 2024, when the minor children were placed with Grandmother, Father has never provided gifts or any basic necessities to his children, nor has he ever sent birthday or Christmas gifts or cards, nor has he provided any sort of financial support, nor has he ever asked if he could visit his children; Grandmother's home is an appropriate placement for the minor children and they are healthy, happy, comfortable, and bonded to Grandmother; and Father has a general attitude of blaming others for his failures in this matter. *See* (12/30/2025 Judgment Entry, p. 4-7).

**{¶79}** In addition to the above findings, the juvenile court specifically considered the best interests factors under R.C. 3109.04(F)(1) and found as follows: (a) Father wishes to have legal custody of the minor children and Mother wishes the minor children be placed in the legal custody of Grandmother; (b) based upon the in-camera interview, the minor children clearly wish to remain in Grandmother's legal custody, or return to Mother's custody if she were well, and do not wish to be in Father's custody; (c) the minor children have a deep-seated fear that Father, if granted custody, will not take care of

them; Father has allowed his anger to affect his interactions with the minor children; the GAL observed and noted that Father did not give the minor children the attention or approval which they sought; the GAL found there was no close bond between Father and the minor children; the minor children have lived with Grandmother since August 11, 2024; the GAL described the minor children as healthy, happy, and comfortable with Grandmother, and that their placement with Grandmother is appropriate; (d) the minor children are happy living with Grandmother; they have friends and enjoy school; they have not lived with either parent since the case was first opened on October 4, 2023; (e) there were no issues of physical health identified for Father; based upon Father's reports of anger and anxiety, he was referred for mental health counseling; however, Father resisted engagement with mental health services for approximately a year and a half after the case was opened; Father unfortunately never internalized the changes that needed to be made in his behaviors; there were no mental health or physical issues identified for Grandmother; (f) it is unknown if Father would honor court ordered parenting/companionship time, although it appears likely that Father's anger or anxiety might have an effect on his actions in this regard; Grandmother is open to parenting time for Father; the GAL believes Grandmother will do what she is ordered to do and will facilitate the relationship between Father and the minor children; (g) n/a; (h) neither Father nor Grandmother have been convicted, pleaded guilty, or have been determined to be a perpetrator; however, the initial complaint filed in this case contained allegations that the minor children were neglected; (i) there is no evidence regarding a denial of parenting time; and (j) Father is a resident of Ohio and Grandmother resides in Texas. *See* (12/30/2025 Judgment Entry, p. 4-10).

**{¶80}** Based on the facts presented, the juvenile court's decision does not go against the manifest weight or sufficiency of the evidence. The GAL recommended that Grandmother receive legal custody of the minor children. The court found Grandmother had good grand-parenting skills and the minor children were happily integrated into her home. The court conducted an in-camera interview with the minor children which this court has reviewed and considered. The minor children have a deep-seated fear of

Father and wish to remain with Grandmother. In a lengthy judgment entry detailing the testimony and statutory considerations, the court reasonably concluded granting legal custody to Grandmother was in the minor children's best interests. This was demonstrated by a preponderance of the evidence. "We do not substitute our judgment for that of the trial court in considering the weight to assign the evidence on best interest factors." *In re M.G.*, 2023-Ohio-3423, ¶ 38 (7th Dist.), citing *Davis*, 77 Ohio St.3d at 417.

**{¶81}** "'[C]ustody issues are some of the most difficult and agonizing decisions a trial judge must make. Therefore, a trial judge must have wide latitude in considering all the evidence before him or her . . . .'" *In re M.G.* at ¶ 39, quoting *Davis* at 418. The trial judge heard and saw the parties as they spoke and judged their credibility, sincerity, and attitude, "which is the trial court's primary function and prerogative." *In re M.G.* at ¶ 39, citing *Davis* at 418-419. The juvenile court's decision was supported by competent, credible evidence, and we do not find the court abused its discretion in granting legal custody of the minor children to Grandmother. *See In re M.G.* at ¶ 39. The minor children deserve safety and stability at this time which can only be accomplished through legal custody to Grandmother.

**{¶82}** Father's second and third assignments of error are without merit.

## CONCLUSION

**{¶83}** For the foregoing reasons, Father's assignments of error are not well-taken. The December 30, 2025 judgment of the Carroll County Court of Common Pleas, Juvenile Division, granting legal custody of the minor children to Grandmother following evidentiary hearings is affirmed.

Waite, P.J., concurs.

Robb, J., concurs.

Case No. 26 CA 0989

[Cite as *In re D.W.J.*, 2026-Ohio-2892.]

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas, Juvenile Division, of Carroll County, Ohio, is affirmed. Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

### NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**